We will hear argument this morning in Case 2420, HOLD v. Palestine Liberation Organization and the Consolidated Case. Mr. Yelowitz. Mr. Chief Justice, and may it please the Court, the United States can take many actions in response to terror activity abroad by the PLO and the PA that kills American citizens. The government could, for example, prosecute them under our criminal laws, and they admit doing so would not violate any due process rights. They contend, however, that bringing a civil action crosses a red line, is unconstitutional under the Due Process Clause. That is incorrect. The federal government's sphere of sovereignty is sufficiently broad that it follows American citizens wherever in the world they might travel. The government could, for example, simply ban payments to terrorists who have killed Americans and concomitantly could establish federal jurisdiction when that ban is violated. Here the government took a smaller step of providing that if the PLO and the PA make post-enactment payments to terrorists or engage in post-enactment U.S. activities, that will be deemed a submission to the jurisdiction of federal courts in a narrow class of cases closely related to terrorism. The statute gave the defendants fair warning. Their conduct was knowing and voluntary. The statute reasonably advances legitimate government interests in the context of our federal system. The judgment of the court should be reversed. I welcome the court's questions. If we analyze this under the Fifth Amendment, what limitations would the Fifth Amendment provide for personal jurisdiction? So first of all, the Fifth Amendment requires fair notice and opportunity to be heard, which the defendants had. In addition, it protects persons against arbitrary government action. Here the statute reasonably advances a legitimate government interest and within the context of the federal government's power. How would that differ from analyzing it under the Fourteenth Amendment? Under the Fourteenth Amendment, there is a territorial limitation on each state. The states, because they're bounded by each other within the context of our federal system, at least the court has ceded horizontal federalism in the Fourteenth Amendment, and so that limitation would exist. When you say horizontal limitation, what do you mean? And exactly how would the Fourteenth Amendment apply, and how would that differ from the application of the Fifth Amendment? So we don't think that the Fourteenth Amendment would apply at all here. However, if the tests were the same under the Fourteenth and the Fifth Amendments, the court would have to look at the interests of the federal government in the same way that it looks at the interests of the state governments, because the state governments are bounded by limitations that the other faces, that California can't infringe the sovereignty of Ohio, for example. Federal government doesn't suffer from that limitation. Federal government's powers are more expansive. Well, there have been many courts that think that just as in the Fourteenth Amendment, we look to see whether a defendant has minimum contacts with a particular state, these courts say so, too, we should look to see whether a defendant has minimum contacts with the United States when it comes to the Fifth Amendment. Certainly, if Congress has not spoken, that would still be the rule under our proposed test. So, for example, in the Daimler case, there was no statute providing for federal jurisdiction minimum contacts would apply because the plaintiffs would have to travel under the Fourteenth Amendment in the Alien Tort Statute. But where Congress has indicated the jurisdictional contacts that are relevant, due respect for Congress's judgment, would provide for a more expansive view. Well, why is that? If the minimum contacts test is a constitutional test, why does what Congress says in a particular statute modify that? Because the minimum contacts test grows out of Fourteenth Amendment cases that provided for limitations on state governments. Those limitations do not apply to the federal government. The Court has said that even in the Lochner era when the Court was imposing those kinds of limitations, the Court said that those limitations don't apply when the federal government's powers are at issue. And I'm thinking of Bennett against the United States, Burnett against Brooks, Cook against Tate. Well, why would they be relevant even if Congress hadn't spoken? I mean, if they're really a feature of interstate federalism, and that's their role under the Fourteenth Amendment, why would we care about the minimum contacts analysis even in the absence of a statute where Congress tried to override it? So the Court has said in the Omni case that there has to be a statutory basis for jurisdiction. And if there's no statutory basis for jurisdiction, then plaintiffs obtain jurisdiction by service under state law. So it would be that the Fourteenth Amendment, so it's not, I guess maybe I misunderstood you, you're not saying that Congress would be overcoming some background principle that would otherwise be applicable to the jurisdiction of the United States, you're simply saying that there would be no statute authorizing service of process in that hypothetical?  Correct. Can I unpackage your argument? You're basically saying there is no due process protection whatsoever under the Fifth Amendment, even for U.S. citizens, because I don't know why it makes a difference that this is a foreigner or a U.S. citizen. If there is, as you're advocating, no Fifth Amendment due process constraint on government, then Congress could, up to its own whim, say you committed an act in New York, it violated a federal statute, get tried in California, get tried in Alaska, get tried in Hawaii. You might say political factors could constrain that. But haven't we said when we've analyzed the Fourteenth Amendment that there are two components? One is the interstate interest of constraining the states from expanding their jurisdiction. But we've also said there's a second component, which is fairness. And it doesn't seem, and we've not limited that to the interstate concerns. Why would we take it out of the Fifth Amendment altogether? I don't think you would. So the rule that we're recommending would include a fairness or a reasonableness component that protects citizens and noncitizens alike from arbitrary federal action. So for example, if Congress passed a law that said if you enter Paris, France, you're subject to the jurisdiction of the district court in Paris, Texas. That would be an arbitrary government action that would violate due process rights of anybody being tried under that statute. However, when it comes to U.S. citizens, Congress and the courts are nationwide actors anyway. And so for example... Yeah, but if I live in New York and I've never left New York, which is highly unlikely, or I'm in Idaho or somewhere else on a farm and have never left it, and all I did was something there that happened to violate a federal law, I might have a problem with being held to Hawaii or Alaska. So Congress has in some cases provided for nationwide jurisdiction. For example, the U.S. Court of Federal Claims is a nationwide court. And what the courts have done as a practical matter, sensitive to the problems that individuals might have, is the courts will go to them, or by rule the courts have said, you know, you can't be... Your trial subpoena will only be 100 miles from where you live. We're not advocating a rule that would eliminate a reasonableness or fairness. Some sort of fairness requirement. Right. You're just saying that here it's met. Correct. And by fairness, are you talking about principles of individual liberty? I mean, I'm sort of focusing on the Insurance Corp of Ireland case and the idea that due process not only in the 14th Amendment context has this notion of principles of federalism and interstate sovereignty, but also the concern that Justice Sotomayor was picking up on about sort of a liberty interest in not being hailed into a court far away. And I would think that would apply even in the international context. Right. I think that it... I agree with that. I think that there's not a liberty, there's not a reasonableness problem in this case. Right. Nobody said, oh, it's too difficult for us to go from 65th Street down to... No, I understand on the facts of this case, but to the extent that we are trying to assess what the Fifth Amendment requires in terms of personal jurisdiction, isn't there some idea, in addition to what the 14th Amendment says about federalism, which you say doesn't apply in the Fifth Amendment context, is there still some notion of a personal jurisdiction limitation in the Fifth Amendment that is rooted in these principles of liberty? I think so, yes. We're not advocating for a complete removal of any protections that an individual might have because it's traveling under the Fifth Amendment. What we're saying is these territorial, these very tight territorial limits that we've seen in the 14th Amendment cases have no place in an analysis dealing with a federal statute. So what again do you think is the Fifth Amendment test? Sure. So we would say that the statute has to provide fair warning and that it has to reasonably advance a legitimate government interest in the context of our federal system. What's an example of an illegitimate government interest that is unreasonably advanced? Well, I think that my Paris, Texas... Wait, what is it again? What is your Paris, Texas example again? Sure. If you drive a car in Paris, France, then you're subject to jurisdiction in district court in Paris, Texas. You know, they're both called Paris, so, you know. I mean, you think, could Congress say that if one American driving a car in France causes injury to another American driving a car in France, a suit may be brought in the United States? Well, it would be, that would be a more difficult case than ours because it's hard to see what the federal... Well, I understand it's more difficult than ours, but maybe we don't have to say what the Fifth Amendment test is, but you've offered a Fifth Amendment test and I'm trying to understand what it means. It would be difficult to see what the federal interest is in regulating traffic laws or auto accidents. Providing compensation for Americans who were tortiously injured, no matter where the tort occurs. Sure. That, that's, and I think that, I think that Congress has very broad foreign commerce powers and obviously if Congress legislated to the limit, then that would be a, that would be a interesting and difficult case. Mr. Yelowitz, I'm struggling to see any of this in your brief. I had understood your argument in your brief to say that under the Fifth Amendment, due process just requires service, a judge, and an opportunity to be heard. And now you're saying that there's some sort of balancing test or reasonableness requirement and I just didn't see that in your brief. I saw hints of that in the government's, but not yours. So, um, and I guess I'm asking is, where does this come from then if it, if it's, if I'm right that it's not in your brief, where, where did these requirements come from? So we see three threads of due process jurisprudence from the founding, service as you say, a court as you say, and then there's a debate among scholars about whether due process included a substantive component.  You say substantive due process precedents require no more than what I've just described. That's that's page 22 of your brief. Right. Right. So now I'm hearing a slightly different version of your argument. I would say that for those members of the court who believe that there is, there is a, I'm, I'm really not interested in your, your, your attempt to assemble five votes. I'm interested in your views on what the law is. Well, look, I think that the, that, that at a form of substantive due process has been a long tradition in the court and in this country, and we're not arguing in this case that, um, that arbitrary, that an arbitrary statute would be constitutional. We think that we think that one man's arbitrariness is another man's brilliance. I mean, no, no member of Congress who votes for something and the president signs thinks that what they're doing is arbitrary. I don't disagree with that. I understand. I understand the point you're making and I don't disagree with it. Thank you, counsel. Justice Thomas. Anything further? Justice Alito. All of our cases, um, have spoken about under the, uh, 14th amendment have put in a substantive due process component that's independent from the interstate question. That is, that is the court's jurisprudence to date. Correct. So all of our cases have spoken about some, some version of fairness, right? And, and, uh, particularly given the, um, given the foreign policy, national security issues in this case, I would say, no, I know you want to win, but that's no, but I would, but justice, um, uh, Gorsuch was limiting saying that there is no, that there is no substantive due process component to due process. There are those who have that view. We don't need that to win the case, particularly given the, the deference that the court, the deferential standard of review that the court engages in, in a, in a case involving national security and foreign policy. Thank you. Justice Kagan. And just so I understand your test, um, uh, it's a non-arbitrariness test or it's a fundamental fairness test. What is it? Uh, non-arbitrary. Uh, would that, is that different from a fundamental fairness test? I, I, I understand it better. I, I find fundamental fairness to be squishier, squishier, but we, we, we have used that squishy concept when it comes to the 14th amendment. Yes. Indeed. And, and when it comes to the 14th amendment, we've said that that along with federalism concerns that don't really play here, but that also fairness concerns lead to a minimum contact test. So why wouldn't we say the same thing here? There's no reason not to say the same thing here in this case. I think that the, the concerns that Justice Sotomayor were talking about, about, you know, having somebody without resources required to travel far and defend a case, those don't exist in this case. So to the extent fundamental fairness is worried about, um, unfairly burdening, deeply unfairly burdening a defendant with, with the act of defending a case in a faraway locale, that is not a problem in this case. Okay. I mean, I guess I am a little bit, uh, maybe I'm just not understanding the test, but I do, do want to understand it. So let me press you a little bit more. Um, it's not a problem in this case because you think that there are minimum contacts here. So even if there were a minimum contacts test, it would be satisfied here. Is that what you're saying? No, that's, that's not what we're saying. I, well, let me back off of that a little bit. I think that there, that one way to consider the minimum contacts test is to ask, did the defendant direct its activities and a person within the protection of the sovereign? And here that test is certainly met. These defendants directed their activity at US citizens who are within the protection of the United States. I don't think that that would be usually the way that we would explain what minimum contacts was looking for. We would usually talk in terms of like something like purposeful availment of the sovereign. So here that would be the entire United States, something like that. Well, that, that's true in a, in a commercial case, but here we're talking about intentional torts. So the, the, the analysis is a little bit different with an intentional tort because you're not really availing yourself of anything by, by blowing up a bomb. But you're not taking issue of like, uh, with, and I guess like Justice Gorsuch, I thought maybe something different from your brief, but as I understand it, you're not taking issue with some sort of substantive component, call it non-arbitrariness, call it fairness. And you're not really taking issue with a minimum contacts test as long as it's kind of your version of minimum contacts. That's fair. I mean, you say our version. Well, which is like, if you direct yourself to, um, individuals with direct yourself to the sovereign entity to individuals within the protection of the sovereign entity. Right, right. So the, the, the sovereign sphere of the state of Nevada ends at the border. So when, when the plaintiffs in Walden against Fiore traveled to Georgia, they were not within the protection of Nevada anymore. It's different for federal, for US citizens, wherever in the world you travel, the protection of the United States travels with you. And so the sovereign interests are different. So when, when you think of, and some of the, like the lower court in this case talked about they, they didn't conduct any activities within the territory of the United States. That's the wrong way to think about the sovereignty of the United States. It's a sovereign by sovereign analysis. Sovereignty of the United States is much broader than the sovereignty of the state of Nevada. Justice Gorsuch. So I've got it right. Do you want us to adopt the fundamental fairness language from our 14th amendment jurisprudence, but give it different content in the fifth amendment? Is that fair? Um, I don't think you have to adopt the fundamental fairness. No, but to get your five votes, that you're willing to do that. I would be willing to do that. Okay. And if we did that. I'm not going to lie. Yeah. No, I appreciate that. I'm just trying to understand where the ball is balanced because it's bounced considerably from your brief. Um, and, and this fundamental fairness test, do you have any historical pedigree for it? And, um, because it's not what we do in the 14th amendment, you've conceded that. So where does it come from? So if I'm not just making it up, the fundamental fairness test comes from international shoe. Okay. But that's the minimum context test that you were discussing with justice Kagan. And you're saying, no, that's going to apply very differently because it's, it's, it's, it's, it's the United States rather than a state, but you get into the, you get into the same, if it's fundamental fairness, you get into the same notice and opportunity to be heard. And you'll get into whether it's reasonable to be hailed into Paris, Texas, and all those kinds of questions, don't you? I, I, um, I think that if you adopt a, a substantive due process overlay, then that's where the law takes you. That's where the court's precedents take you. Do you have any basis in history for that? No. I think that if you go back to, um, what, what the founders were doing, what this court was doing in the early years, um, you don't have any. I mean, back then it was, yes, there's international law of nations, but Congress can defuse that when it chooses. That was the law.  Very clearly there was, there were jurisdictional limitations that the courts applied. They came from the general law of nations. They did not come from the constitution. You know, just a story set. If Congress says otherwise, we have to follow that. Correct. Then it becomes a political question between international sovereigns. And not just, just a story. That's, that is. Oh, sure. He famously said it. Right. It's all over the cases. Okay. Now let's say we have to apply our minimum contacts test because you've kind of taken us there a bit, or at least close to it. I'm wondering, I understand, you know, there's A and B in the statute here. Right. And, uh, A had to do with the payments abroad. Right. And B had to do with maintaining an office here. I get the analogy that B is sort of like, a little bit like, um, what we would do in the 14th amendment context. You maintain an office in a particular jurisdiction, you're kind of opening yourself up to all manner of suits. But A is purely extraterritorial behavior. Um, and I'm wondering, is B enough for you in this case? Do you need anything more than B to bring the suit? We, we, we don't need more than B, but Congress gave us both. I understand that. But if, if, if the court were to say, and follow your lead today and say, well, you know, something like fundamental fairness and minimum contacts, let's just say we did a straight up 14th amendment analysis under our existing precedent and said B is a lot like, um, having an office in a particular jurisdiction. Is that enough for you? Is that enough of a victory for you to pursue the suit? That would be a suboptimal solution for us.  Because, um, in candor, because the defendants have contested whether they have come within B, they don't contest that they've come within A. Yeah. And the case is old enough to go to law school. Well, they, they say, I appreciate that. They, as I understand it, they say with respect to B, they're doing, they're maintaining their offices extra legally and that therefore should make a difference. If this court were to say that doesn't make a difference, that they're maintaining offices here through the grace of executive non-enforcement, that's enough to open them to jurisdiction. Does that, is that enough for the suit to proceed? If the court were to apply the statute and say the, the, the record is sufficient, if, if this court were to say the record is sufficient to conclude that the activities set out in the record are within the text of the statute, which is unambiguous, then, um, that's enough for us. And so there'd be no need to opine on what, what limits are, may or may not exist under the Fifth Amendment. We could simply say under our Fourteenth Amendment jurisprudence analogy, uh, it would, it's enough. Correct. And that would satisfy you. I, if the court, I want to be very clear. If we applied B. Right. I want to be very clear because. I want to be clear too. Yeah. We've, we've had, um, we've had a very long journey. I do appreciate that. And, and, um, and a, a, a remand back to the panel for further application. That's not what I'm, that's not what I'm asking for us. But, but if we were to say B applies, you're good to go. Congress has made it in either order.  All right. Thank you. All right. Mr. Kavanaugh. I understood your argument in the brief to be arguing in the alternative. That's correct. And to have a, what I would say, a, a broader argument that, that Congress, uh, there are no limits on Congress, uh, constitutional limits other than service, the process, et cetera, but there's no extra personal jurisdictional limits on Congress. And then that you are arguing, even if that were rejected or even if that's not correct, we have a second argument that even under the 14th amendment precedence, you still win. That's correct. Okay. And you're not giving up that first argument. Absolutely not. Okay. Just making sure. Okay. And then what role does international law play? Any Congress can override that. I assume to be your position, but I just want to make sure I have that nailed down. Right. So, so if Congress hasn't spoken or hasn't spoken clearly, then the international law, will there be a presumption of compliance with international law? In, in this case, there's no conflict between what Congress has done in international law, but Congress is free to override international law. Thank you. Ms. Barrett. I want to describe one way to understand your argument and I'd like you to tell me if, if this is one way to understand your argument.  Um, so the fifth amendment obviously predates the 14th amendment by quite a bit and we have a line of precedent, justice stories cases being a prime example. We have others that understand the fifth amendment and the way that you propose for your broader argument. Then we have a distinct line of cases that pick up with international shoe that interpret the 14th amendment differently. So we have competing lines of precedent. It's one way to understand your argument. Like let them just keep going separately in parallel. Maybe international shoe is wrong. Maybe the 14th amendment precedent is wrong, but don't disturb it. Just stay the course with the fifth amendment precedent and if their intention, so be it. Right. This is not the case to resolve how the court should deal with the 14th amendment. Well, do we ever have to resolve that question on your view? Can we just let the fifth amendment and the 14th amendment precedent, because I mean, is in your view, would we be overruling some of these other cases? These fifth and not, not the fourth. Don't shake your head too soon. If we treated the fifth amendment as having the minimum context type requirement, would we have to be, if we treated the fifth amendment that way, would we be essentially overruling some of the 19th century cases that take the justice story view? That's an interesting question. So I think that, I think it wouldn't be overruling those cases to say that the sovereign power of the government is sufficient to protect Americans abroad. And the reason I think that is. Well, that's not quite the question. I mean, I'm asking if we say, you know, Justice Kagan's questions are pointing out that we have treated the 14th amendment as containing a fairness component. And I don't understand your argument to be in a full-throated way, your broader argument, in a full-throated way to say, yes, there's a fairness component that would lead us to embrace the minimum context analysis for purposes of the fifth amendment. Is that correct? Correct. Okay. So if that is your argument, you are arguing for the fifth amendment to be interpreted differently from the 14th. Correct? Correct. So if we say, no, no, no, no, no, the 14th amendment analysis, not the interstate federalism prong, but the minimum context prong, the fairness prong applies in the fifth amendment context. Is it your view that we would be overruling cases from the 19th century in, say, the justice storyline? Or at least rendering a decision that would be in some tension with those cases, which took a different view of the fifth amendment? I think that a decision to that effect would be in tension with those cases, yes. At the time that the due process clause was ratified, there was no… Which due process clause? The fifth amendment? 1791. Okay. The one we're here about. There was no territorial limitation at all embedded in it in any way. And so, and in fact, the founders quite frequently litigated cases arising outside of the United States. Famously, the Philadelphia Convention was packed with lawyers who had litigated those cases. So was Penoyer wrong to have a territorial understanding of, you know, of personal jurisdiction within the due process clause of the 14th amendment? I don't… I think that what Penoyer, the way I read Penoyer and the way Professor Sachs reads Penoyer is that Penoyer was constitutionalizing kind of a narrower view of due process, which is there has to be a judge with jurisdiction, there has to be an opportunity to be heard, Murray's lessee view of due process. I think the territorial restriction, the idea that there was a territorial, horizontal federalism basis, I think that came into the course of jurisprudence in the Lochner era. Do you agree with Professor Sachs' amicus brief? Oh, yeah. Okay. Thank you very much. Justice Jackson? Yeah, I just want to know, is that amicus brief and Professor Sachs' opinion the basis for your certainty about what happened at the founding? I mean, is there other evidence? It's confirmatory of our views. Judge Sofair also put in an amicus brief that talked about founding era evidence. But did you go to the original sources or are you relying on them for your view as to what the ratification state of affairs was? As a matter of fact, I spent a lot of time with the original sources. And you found no evidence? How many sources? What is the scope here of our understanding of what actually happened then? I think it's very clear that at the convention and at the Philadelphia convention and at the ratifying conventions, the members of the convention and the founders urging ratification viewed the power of the judiciary and the power of the legislature to be coextensive. That's in the ratifying conventions. That's in Hamilton's Federalist No. 80. It's also clear from – this is secondary sources, but they're cited in my brief, Bergen-Young, for example, and Deirdre Mast's article, that the founders litigated those cases, those extraterritorial cases. And then the only question is, well, did the Fifth Amendment change that? Did the Due Process Clause erase that baseline understanding? And when you go to what Randolph said in his report on the Judiciary Act, when you look at the Judiciary Act, which was Senate Bill 1 in the first session of the first Congress, written by – in the hands of Ellsworth and Patterson, you see people who were in the room who thought that it was perfectly okay to allow for extraterritorial – But you can see, as Justice Barrett pointed out, that we do have a 14th Amendment due process set of cases and interpretations that have a different view about the extent to which there are limitations that relate to context. Right. So I agree with that. And I would say two things about it. First of all, seated within that jurisprudence is the idea of this horizontal federalism, which, even if you want to say it's the same standard, it's going to be a sovereign-by-sovereign analysis. That's what Justice Kennedy's plurality said in the – How do you explain Insurance Corporation of Ireland, then? Insurance Corporation of Ireland – Where it was very clear – or the fact that we have waiver in these kinds of situations, meaning isn't there some concept of individual liberty? If not, you couldn't waive this if it was all about territorial sovereignty. Right. And as Your Honor pointed out in Mallory, it's a waivable right. There is a right, and it's waivable. Thank you. Of course. Thank you, Counsel. Mr. Kneedler? Mr. Chief Justice, and may it please the Court, the Act of Congress, that issue here, is an integral component of the foreign policy and national security policy of the political branches, including the securing of compensation for victims of terrorism. Congress determined that it is fair to deem the PLO and PA to have consented to personal jurisdiction in suits under the Anti-Terrorism Act if they made payments to or on behalf of persons who injured or killed Americans in acts of terrorism or engaged in certain activities in the United States. Both of those forms of conduct that are jurisdiction-triggering are knowing and voluntary. They have a clear nexus to United States territory and to United States nationals and to the compelling U.S. interests in deterring terrorism. And the scope of the resulting submission to United States jurisdiction is very limited. It is not a general jurisdiction. It is narrowly limited to terrorism cases. Congress has the constitutional authority and institutional capacity to weigh the various interests, including the distinct status and international engagements of the PLO and PA, the United States' unique and long-term relationship with those entities, the imperatives of national security and foreign policy, and fairness to the claimants and to the foreign defendants. Congress' judgment on these issues, as in all issues of national security and foreign policy, are entitled to great deference. The act providing for jurisdiction here is eminently fair and does not deprive respondents of due process. This court should sustain the statute. I welcome the court's questions. Mr. Needler, just to take a step back, do the PLO and the Palestinian Authority have constitutional rights? We have not taken a position on that question. We have assumed that they do. That question is itself of some sensitivity to have the court determine or a court determine in a judicial proceeding whether a particular entity is like a sovereign, is a sovereign. To what extent is it like a sovereign? We urge the court not to delve into that. We have not taken a position on that because of the sensitivities in this particular arena. But we do think that the status of the PLO, assuming argument that it has some NPA, that they have some constitutional rights, that status is still relevant to the application of due process because, for the reasons that I gave, the United States has a long-term relationship concerning them. It's complicated. It's nuanced. But the deterrence of terrorism has been at the center of that policy for the last four decades, and the United States has taken consistent efforts to dissuade the PLO and the PA from supporting terrorism. Didn't the Justice Department take a different position in the 1980s that the PLO did not have constitutional rights? Well, you say a different position. We're not taking a position here, but in those cases — It was different from the non-position. Those cases were not about due process with respect to being held into U.S. courts. They were First Amendment cases by and large that had to do with the permissibility of the United States closing the Palestine Information Office or limiting the expressive conduct of those entities in the United States that we think, in those situations, the United States surely has the authority to expel the PLO to close an information office, to close any office for that matter, and to limit what they may engage in in the United States. I think that the due process question of being deemed to have submitted to the courts of the United States may present a different question. Counsel, you articulated your jurisdictional approach in the terms of the particular facts of this case. Could you articulate it more generally, how it would apply? In other words, you focused on the facts, and that's perfectly appropriate. But if we were to articulate the general test and how it would apply, how would you articulate it? Well, I think there may be different circumstances. The statute here is worded in terms of consent to jurisdiction where the PA and PLO are deemed to have consented to or to submit themselves to the jurisdiction of the United States courts. In that circumstance, we have proposed a test that depends on whether the conduct that is jurisdiction-triggering is knowingly involuntary and whether the resulting submission to jurisdiction is fair and not exorbitant. The dissenting opinion from rehearing en banc in the Court of Appeals also said that there should be a nexus between the United States and the conduct involved. I'm sorry, but if you're not relying on consent, then you have perhaps a different analysis? Well, it sounds like it's a grab bag. I mean, it sounds like it's got to be fair. It can't be exorbitant. There has to be a nexus. I mean, that's a bunch of words. I mean, could you be a little more precise about what exactly we should be looking for? Well, what I was describing went to the question of consent, and we were building on the consent theory that came from this court's decision in Mallory and other cases under the 14th Amendment where the conduct has to be voluntary and, I think, some element of fairness or nexus to the jurisdiction. So in that part of what I was saying, in that part of our argument, we were saying that the circumstances here can be analyzed under the 14th Amendment standards. It's obviously not the 14th Amendment itself and the United States. It's different from states. But with respect to consent, the factors that I've identified and the statutes written in terms of consent would be relevant to consent. If you're not talking about a situation of consent, then you get into something that's more parallel to international shoe. I do want to make an important point here, though, in response to Mr. I'm sorry. Are you asking us to apply the 14th Amendment standards, or are you saying the Fifth Amendment is different? We do believe the Fifth Amendment is different. The Fifth Amendment, as Justice Barrett was pointing out, was historically understood to assume the law of nations, general law applies, but Congress can reject that. And when it does, this court has to follow it. That was the historical rule in the Fifth Amendment. As I understand it, unless I'm mistaken. Well, that was the understanding, certainly, that Justice Story expressed that. I don't think any of those cases were actual. And the charming Betsy and a whole bunch of others, right? With respect to sovereign immunity or other aspects of jurisdiction, yes. But those decisions, particularly the Justice Story ones, were not presented with a case in which Congress actually had disagreed with international law. And here we do have that. And Congress has adopted A and B. And you talk about the importance of the sensitivity of foreign relations and that this court is not well positioned to do that, and the political branches are. And if all that's true, then how do we have this fundamental fairness overlay that you're now discussing in your brief in the Fifth Amendment context? Well, again, the articulation of that test was looking at it under the rubric of consent, which. . . Under the 14th Amendment rubric? I just want to be clear. Yes, but. . . Okay, I'm talking about the Fifth Amendment. No, I understand that. All I meant is that because the statute is written in terms of consent, if the court chose to analyze it under consent. . . I'm asking you to put aside the 14th Amendment concepts for now. Okay. And under the Fifth Amendment, does this court have any role in saying that what Congress has done is improper? I don't think it has a role here. I'm reluctant to say that there is no role because one could imagine any sort of act of Congress. I think. . . Yes, and that's the tension I see in your argument. On the one hand, you say historically the Fifth Amendment was understood to mean we respect what Congress does in this area. And you started off. . . Your introduction was all about how we owe deference to the political branches in this area. But it seems at the same time you want a safety valve for this court to overrule some instances in which Congress does speak. Well, I. . . And defeats international. No, all I'm saying is that the court doesn't have to go there. And we think it would be prudent for the court to wait for an act of Congress because it takes an act of Congress to provide for personal jurisdiction other than following the rules of the state. Well, I think it would be prudent for the court to look at the particular act of Congress involved, what the rationale for that statute was, and see whether it would comport with due process. Last question. I'm sorry. I'm almost done. If we were just to analyze this under the Fourteenth Amendment precedents, same question I asked your friend earlier. B, I kind of understand you have an office. And I get the Mallory analogy. I do. I understand that. But whether it works is another thing. But A is a little bit different. It's purely extraterritorial behavior. And that's a little harder to square in my mind with our Fourteenth Amendment jurisprudence. Do we need to decide A? Is it enough to say this case survives under B, even apply our Fourteenth Amendment? Well, we agree with the plaintiffs that it would be prudent for the court to address both. But do we need to? I mean, if there's jurisdiction under B, do we need to say there's also jurisdiction under A? And we think the payments, and I do want to address, I think, a premise of your question. Because the payments occur outside of the United States, there can't be minimum contacts with the United States. But this is a place where we think the Fifth Amendment would differ. Okay. That answers my question, if you say it's different than the Fourteenth Amendment. So we need to do something different. I'm sorry, Justice Kagan. No, no, no. That was helpful. I hear you, Mr. Kneedler, as being reluctant to go to a place where you say that anything Congress says goes. I mean, obviously, you're saying here what Congress said goes. But you're reluctant to say anything. May I continue?  You know, anything Congress says goes, there are constitutional constraints. And is that because there would be foreign policy implications that would result from an extremely broad congressional assertion of jurisdiction over foreign nationals? There could well be. I mean, I think that would be one of the reasons. And Congress proceeded cautiously here and tried a number of ways to provide for these suits. It could. But one can imagine, especially in these days, if you subjected someone around the globe to general jurisdiction in U.S. courts, the court might be troubled by that. And this is far from that. The court might be troubled. I'm really asking whether the Solicitor General representing the United States is troubled by that. I could understand an argument which would say that if Congress does something that really stretches very far and wide, it could have foreign policy consequences. It could encourage other nations to retaliate and treat U.S. citizens in the same way, that sort of thing, where the United States might be. You tell me if you are, but might be reluctant to have a court rule that says anything Congress says goes in this area. Yeah, there could well be problems with other countries' reactions to that and retaliation, perhaps. I do want to complete the thought, if I could, about why the Fifth Amendment would be different. Do you want a narrower rule than sort of anything Congress says goes? We would be pleased with a rule that is broader than what we've urged here, but we think it would also be useful to proceed incrementally. The court wouldn't have to confine it to these precise circumstances, which are compelling. But the point I wanted to make, which I think could be part of a test if you're not looking at consent, is that I don't think minimum context would be the right way to look at it. It would be, I think, at most, a nexus of some sort to the United States, which is what Judge Manasseh, in his dissenting opinion in the Court of Appeals, said. And here you have a nexus. It doesn't have to be territorial context because, as plaintiff's counsel pointed out, the United States has sovereign authority to extend laws and judicial jurisdiction beyond the borders of the United States. Here, the conduct abroad plainly has a nexus to the United States. The payments prong concerns acts of terrorism that injure United States persons abroad. Thank you, Mr. Kneedler. It might help me get a handle on the positions of the respective parties if you could tell me in what significant respects the position of the United States differs from that of petitioner. I don't think about I don't think the position really. Not to the judgment, the analytic approach. I think the analytical approach that I've described is consistent, entirely consistent with what plaintiffs have argued. They are making a broader argument sort of categorically and affirmatively at this time. We have not, which is not to say that we may not embrace that at a later time. But we think that that's an issue that should that this court should decide on the basis of full briefing and analysis in a situation where it might really matter. But but here we think this fits comfortably into even Fourth Amendment, 14th Amendment principles, but certainly the Fifth Amendment principles with respect to Congress's ability in this area to to provide for jurisdiction. Thank you, Justice Thomas. Mr. Kneedler. The Chamber of Commerce, Mika's brief indicates that the Justice Department has had a consistent view that these organizations did not have constitutional rights. Do you think the brief is accurate? And if it is accurate, is this now a change of position? Again, the cases that from from back in that era concerned, I think, I think all of them concern the First Amendment and Congress's ability to deal with the PIO and the Information Office and and the PLO with respect to their domestic activities. In the prior round of the Sokolov case where the Second Circuit held that the that the respondents here do have due process rights, we did not take a position on that question at the time and we urged the court to deny certiorari in the case so that that has been. Once we have now looked at the due process question, and this goes back, I think, at least 10 years. I forget when that when the prior was. So we we have not advanced the position with respect to due process in those intervening years. Justice Leal. Mr. Kneedler, I understand that you're trying to wend your way through some sensitive territory, but I could use some help about problems that I see along the course that you are recommending. And start with the argument that we could say that this that there's jurisdiction, there would be jurisdiction under the 14th Amendment case law because of consent. What limit do you see on the ability of a state to impose a regime of constructive intent? I mean, suppose that a state said that anyone who commits a tort against one of our citizens is deemed to have consented to our jurisdiction, regardless of where the tort occurs. Would that be consistent with our 14th Amendment case? It would not. And I think maybe I misspoke or wasn't clear about 14th Amendment. I didn't mean literally the 14th Amendment standards as if the United States was a state. I meant that the 14th Amendment principles as applied to the United States rather than a state. And so with respect to a state, there may be issues, as you suggested in Mallory, with respect to the ability of a state to condition subjection to jurisdiction on the basis of doing business in the state. But Congress has a much broader authority with respect to under the Commerce Clause, for example, to condition someone's participation in our economy than an individual state does. So then it does seem that you are not really saying we can find that there's personal jurisdiction here simply by applying the 14th Amendment. We have to look to a different standard. No, what our brief said or tried to say is you can look at 14th Amendment principles, not the literal application of the 14th Amendment principles with respect to consent. Apply those to the somewhat distinct situation of the United States under the Fifth Amendment where Congress is not limited in the way a state is in conditioning access to the economy or to other aspects of the United States' interest in the way that a state is. And then on the question whether it would be enough, whether there would be personal jurisdiction because the PLO has an office in the United States, that is a factual issue, isn't it, that has not been resolved by the lower courts. So we would have to do that in the first instance. Or remand to the Court of Appeals. Yeah, it's really activities. There are no offices aside from the U.N. office, although there are allegations that that office is being used or has been used for activities extending beyond the role at the U.N. And so then if we say, if we look to the 19th century cases, the statements that Justice Story made, you don't want us really to say, you don't want us to adopt that fully. We'll presume that Congress is respecting international law, but if it says it's not, if it's authorizing jurisdiction where that would be contrary to principles of international law, that's fine. You really don't want us to say anything goes. But if we don't say anything goes, then we have to say what doesn't go. Or we have to explain why this would meet, why the facts here would meet whatever standard is required. How do we do that? You don't want us to say anything goes, but that means we have to say what the test is, and then what is the test? Well, we don't want you to say, I mean, we are not disagreeing with the basic proposition that Congress has broad authority in this area. Well, let me just rephrase it. At one point you said, I thought you just said a few minutes ago you'd be pleased with a decision that says Congress can do whatever it wants. But I understood your argument to mean that you really don't want that. I did not mean to say that, and I think that the question of how far Congress's powers go could, as Justice Kagan pointed out, the farther it goes may create other problems. No, I appreciate that. But how can we, if we don't say Justice Story was right, end of case, then we have to say that there is some standard that has to be met, and then we would have to explain why this case does or does not meet that standard. So then we have to say what the test is, and that gets more difficult. Well, again, there may not be one test. We laid out a test for consent. There may be a different, probably would be a different test, where consent is not the basis of the jurisdiction, but something akin to minimum contacts, which I think would be a nexus to the United States, because the United States has interests abroad. If those interests are affected, like U.S. citizens or terrorism or other action to the United States in the Middle East, if whatever is being done has a nexus to that, that would be a sufficient basis for the exercise of jurisdiction. Okay, well, just to wrap up, on consent, you want us to say there's consent here, even though there might not be consent or there would not be consent if the state tried to do something analogous and had to meet the 14th Amendment? There may well not be, because this is conduct, the payments prong is conduct occurring outside the United States, so if minimum contacts is thought of in terms of a territorial connection, we don't think that that applies to the United States. Thank you. Justice Sotomayor? Let's go back a moment to your response to Justice Gorsuch. Justice Story did not have a case in front of him involve establishing personal jurisdiction over a person who had no connection to the United States whatsoever. Correct? Right, yes. That was not an issue there. It's interesting that he and other commentators spent so much time making these broad statements, when Congress consistently, that's what Professor Sack pointed to, for over 100 years, pretty much stayed within International Shoe's limitations, no? In all the acts that it created. Well, it created nationwide service of process or even worldwide service of process, like under the antitrust laws. It has proceeded, but it has regulated some things outside the United States that affect its interests. Absolutely, but the absolute statement, it never did. No, it's never gone to that extent. Now, going back to your concession, I think, to Justice Alito, don't think that this fits within our minimum contacts theory of the 14th Amendment. So go with me. If I can't see this as consistent with the 14th Amendment, then those circuits who have said that the 14th and the 15th, like the 2nd, are identical, are wrong. The 2nd Circuit was wrong in that assumption. Yes, we think it was clearly wrong. All right, so now we go to Justice Alito's point, which is, if the Fifth Amendment is different, your colleague, Petitioner's Counsel, argued somewhat what you ended up with in your response to Justice Alito, which is that the Fifth Amendment has some sort of limitation, because there has to be some nexus to a federal interest. Correct? I think the Court can assume that. Again, if Congress passes a statute... We can't assume it if we're going to apply it to this case. No, I think the Court could assume that there's a nexus requirement. If Congress passes a statute where there isn't one, then there would be time enough to decide whether that's valid. So I guess the opinion, the way we would write it, is to say, we don't have to reach the question whether Congress has the constitutional power to submit to our jurisdiction something without a federal interest, but this federal interest is enough. I think that would be sufficient. Another different context may be if it's a U.S. citizen, as opposed to somebody outside the United States. Now let's go to another part of this question, which is the office, or lack thereof. I understood that the provision at issue here, B, as opposed to A, which is the payment prong, but the B prong, do they have to have an office, or could they just be present here at all? Meaning, I thought any activity, whether it was behalf... I think Justice Gorsuch got to this at one point. B could be read, whether they have U.N. immunity or not is irrelevant. The U.S. could choose, if it wanted, couldn't it, to say, we won't respect U.N. immunity with respect to this person, correct? First of all, there's no personal immunity here. The U.N. agreement provides for access to the U.N. by observers like the PLO and PA. But nothing says that the U.S. has to give them that activity of having access. The headquarters agreement does, but the United States acceded to that. They acceded to that, but it didn't have to. Yes, well, and we don't want to suggest that... No, so if we said something like what Justice Gorsuch said, which is the fact that they're here for whatever reason is enough of a connection to the U.S. I think the court could hold that, and processes served in the United States as well. But the only office is the U.N.-related office. The allegations are that that office was abused... But that's irrelevant to the point we're discussing, which is if the statute is written so that any presence for any reason in the United States subjects them to jurisdiction here for purposes of service. If there was such a statute here, the statute itself provided for personal jurisdiction protects or doesn't include or doesn't count the U.N. office and activities that are ancillary to that or meeting with U.S. officials. Those are not activities that count for purposes of triggering personal jurisdiction. You don't think it triggers me or can't trigger me? Is that what you're telling me? The statute exempts from triggering activities at the office that are connected to the U.N. I don't think that's what they... I'll let Petitioner's Counsel address that. Thank you, Counsel. Justice Kagan? Justice Gorsuch? Justice Kavanaugh? I just want to make sure I understand. This is a national security and foreign policy case, as you started with, right? Yes. And Congress and the President have agreed, acting pursuant to the national security and foreign policy principles set forth in the Constitution on what the proper rule here is, correct? That is correct, yes. And there's no doubt that in terms of regulating the conduct that they acted pursuant to those Article I and Article II powers, correct? And Article I Congress establishing the lower courts. So it seems like it's Youngstown Category I situation where the President and Congress have acted together. Now, there is still a role for judicial review to make sure they're not crossing some other constitutional line, but usually that's a very sensitive judgment for a federal court to make, and usually we would require something in either the text of the Constitution or in the historical practice over the years that would suggest some principle that the courts could rely on that would disagree with the foreign policy and national security judgment of Congress and the President acting together. That's absolutely correct. And even to the extent there is a fairness element here, Congress is in a position to weigh in with it. I think you're going to agree with what I'm about to say, but Congress and the President are the ones who make fairness judgments when we're talking about the national security and foreign policy of the United States, unless it crosses some other textually or historically rooted constitutional principle. Courts shouldn't be coming in, I don't think, without that and saying, gee, what Congress and the President are doing here to advance the national security and foreign policy interests of the United States strikes us from our perch as unfair. I completely agree with that, and as I said, Congress and the President's assessment of what's fair in these circumstances, what could be problematic in these circumstances, the ongoing relationship in which terrorism has always been a central element of the foreign policy and national security. And that's why you see bipartisan amicus briefs from the House of Representatives, bipartisan amicus briefs from the Senate. This is a considered judgment that is across the two branches. So I think you said you started with great deference as the principle, and I agree with that, obviously, based on what I've said so far. I'm wondering when that great deference runs out. Well, as I stand here, I can't think of a circumstance in which it would, particularly with respect to entities such as the PLO and Palestinian Authority, which are foreign, non-sovereign entities. Yes, they exercise some governmental power, but there's a unique relationship. They have diplomatic relations around the world, so Congress should have particular latitude, and a court, I think, should be reluctant, if ever, to second-guess that judgment. And I think you'll probably agree with this, too, but it also doesn't strike me as the proper judicial role to seize on international law principles that might be lurking out there somewhere to tell the president and Congress together, acting together, that somehow they've crossed some line. Congress is perfectly, and the president, perfectly capable to take into account whatever international law there may be. And it's my understanding, although I haven't looked deeply into this, that international law doesn't place much emphasis on personal jurisdiction the way we do, but it's up to Congress and the president to weigh whatever, even if it's not international law, what international practice would be or what the reaction of other nations might be in a particular circumstance. But this is narrowly focused on a particular recurring problem that Congress desperately wants to address. This is its third try in doing that. The recurring problem of terrorism. Yes. Thank you. Justice Barrett? Mr. Kneedler, I just want to follow up on Justice Kavanaugh's questions. Given your answers to Justice Kavanaugh, I just want to make sure. I might have misunderstood your colloquy with Justice Kagan earlier, but I had thought that you said, and I may well have misunderstood, that one reason for us not to go the full Boer route, as broadly as Petitioner has asked us to, is because that might have foreign policy implications or that might have national security implications that would blow back. But is that what you said? I think I'm not in a position to say that categorically, but I do think there's some reason for caution. Why? I mean, as you just told Justice Kavanaugh, these judgments about foreign policy considerations are for Congress and the President to make. So if at some point in the future Congress and the President passed a statute that went farther than this one on personal jurisdiction, why would what we do be a foreign policy? I mean, wouldn't we defer to President and Congress then? I guess I'm just struggling to see what the foreign policy concern is with our taking the broad route. But if you announce a broad categorical view here in a situation which it is not, when the court wouldn't be required to do so, it's that statement. Like even if it's true, like the government, like you've said that you're okay with that, well, you think we should just not say it. So even if it's true or even if it's the accurate interpretation of the Fifth Amendment, you're saying, shh. No, I don't think I didn't mean to say we're okay with that. I think we would want to examine questions of fairness to see whether that should be an element or not or whether Congress, in fact, has plenary power. And it may well be that the court, if a situation actually confronted it, that the court would conclude that or that we might submit that. I can't say we wouldn't, but I think it's important, particularly given the parallel development of the 14th Amendment, not to dismiss that out of hand in a case that doesn't require that analysis. Also, there could be other situations in which Congress would provide for personal jurisdiction, like in the commercial sphere, which would not present as starkly the questions of national security and foreign policy. Although there would obviously be some foreign policy concerns about extending jurisdiction, but the circumstances might be different. Justice Jackson. So can I go back to your colloquy with Justice Gorsuch? I didn't read your brief as conceding that historically the Fifth Amendment imposed no limits. In fact, on page 47, you say that that theory is not easily confirmed as a historical matter. And there's nothing in your brief that seems to embrace the proposition that as a historical matter there were no limits on Congress's ability to do this sort of thing. So I just want to give you an opportunity to clarify what the position of the United States is related to Justice Gorsuch's point about what the history shows. Yeah, we are not making that affirmative argument. And if we were going to make that argument, we would want to present a full argument on it either way and fully addressing. But to the Chief Justice's point, this then creates some daylight between you and the other petitioners because they are in fully on this kind of originalist take on what the Fifth Amendment requires and are encouraging us to adopt that broader theory. That's one of two alternatives. Yes, that's one of the alternatives. I appreciate that. But the government is not asking us to do that. We are not asking you to do that. We are. But we are also not saying we're just not addressing. Yes, understood. Understood. But going to Justice Kagan's point in response to Justice Barrett, I mean, I would take your point to be that there could be foreign policy implications either way. And that to the extent that there are announcements that the Constitution of the United States imposes no limit on Congress or the president with respect to their activities internationally or concerning international citizens, that that could you could conceive of a world in which that could be problematic. Yes, I can conceive of that world. And I think, again, before the court, I doubt that the court would want to announce that without the executive branch and Congress supporting it. That's one reason why the broader theory might be we should be cautious in going down that road. I wonder if another possible reason is that we, as far as I can tell, have never applied this sort of methodology to considerations of the Fifth Amendment. And there could be all kinds of unintended consequences to starting to do that. Like, how do we interpret the scope of the Due Process Clause? Do we do it as an originalist kind of exercise? And we haven't done that in other areas. And the concern is that that might open cans of worms that would imperil, for example, you know, what we said in Bowling v. Sharpe, the idea that the 14th Amendment's Equal Protection Clause is reverse incorporated through the Fifth Amendment's Due Process Clause. We didn't reach that through an originalist methodology. And so if we're starting down that road, it just seems like there's all kinds of problems that might arise that we should be worried about. I can't say as I stand here that all those problems would be true, but I do think that they would benefit from an analysis by Congress. And we just have to be careful in thinking about how we go about interpreting the Constitution and the implications that might have on existing precedents in other areas that deal with these same constitutional provisions. Correct? With specific reference to personal jurisdiction, this issue should not come up unless Congress first passes a statute providing for personal jurisdiction, and then we would know what Congress found and what the rationales for it are. In any case, we have the statute, and I appreciate your consent theory. I'm just trying to understand, though. You say that consent, you agree that consent has to be knowing and voluntary, and you said that both forms of the conduct in this statute are, both forms of the conduct are knowing and voluntary. But I thought the knowing and voluntary had to go to the assent to jurisdiction. It's not that they continue to do something that they've already done. It's that if they agree to do this, they are consenting to the jurisdiction. They're deemed to consent. No, I understand. But the question is, how fair is the deeming in a situation like this? And that's where fairness, I think, comes in. It comes in maybe in a case like Mallory or a case here on consent. But like in the Carnival Cruise lines, the passengers probably did not consciously submit to the jurisdiction of the court that was designated in those contracts. So there doesn't have to be a conscious awareness. All right. One final question. I'm sorry. I'm mindful of the time. The Second Circuit in this case said, as Justice Sotomayor pointed out, that the statute does not suffice to establish personal jurisdiction because the 14th Amendment standards apply in the Fifth Amendment context, and they read those as precluding personal jurisdiction here. Would it be enough for this Court at this time to just say, if we agreed to this, that the 14th and Fifth are not equivalent with respect to what is required, the minimum context tax test, and send it back for an assessment of what the Fifth Amendment requires as it relates to the facts of this case? I suppose I could do that, but I would urge the Court to actually decide the question. I mean, it was held unconstitutional. We think the circumstances for this statute are compelling, that it would be useful for the Court to decide that and enable this, at least in the Sokolov case, long-tending case to be resolved finally.  Thank you, Counsel. Mr. Berger? Mr. Chief Justice, and may it please the Court, PSJVTA purports to be a constructive consent statute, but it fails the due process test for constructive consent to jurisdiction established in Bauxite. Bauxite requires that the defendant's actions support a presumption of legal submission to the jurisdiction of the Court, but as alleged here, the defendant's actions do not support a presumption of submission to the Court's jurisdiction. Among other things, the D.C. Circuit and the Second Circuit previously held that the same types of P.A. and P.L.O. conduct are constitutionally insufficient to support jurisdiction over them. Continuing to engage in jurisdictionally insufficient conduct is the exact opposite of submitting to the Court's jurisdiction. And there is no limiting principle if Congress can change that equation and say conclusively what conduct shows submission under the Bauxite due process standard that would entirely collapse the distinction between prescriptive and adjudicative jurisdiction in all Federal question cases. Bauxite also holds that jurisdiction cannot be imposed as mere punishment as it is here when the alleged actions of the defendants do not support submission. The PSJVTA also fails due process under Mallory. Mallory, of course, have held a reciprocal exchange by which Pennsylvania permitted access to its markets in return for submission to the State Court's jurisdiction. Applied here, the Mallory question is, does the United States permit the P.A. or P.L.O. to do anything on condition that they submit to Federal court jurisdiction? And the answer is no three ways. First, the PSJVTA itself doesn't permit any conduct at all. Second, the statute gives no notice that its deemed consent condition attaches to any permission granted elsewhere. And third, the United States has never identified any permission granted elsewhere to which the deemed consent condition attaches. And also to address the questions of several of your honors, Mallory and Bauxite tell us that Federalism plays no role in consent jurisdiction. As a result, Bauxite and Mallory apply equally here under the Fifth and the Fourteenth Amendments and support the Court of Appeals decision. I welcome the Court's questions. Mr. Berger, I know this is not the center of your argument, but could you just explain how P.L.O. and P.A. are persons within the meaning of the Fifth and Fourteenth Amendments? Yes, absolutely, Justice Thomas, and I would respectfully draw the Court's attention back to the February 2018 amicus brief filed by the United States in an earlier round of this case in which the government's non-position was considerably more of a position and basically said there's only one type of person that this Court's precedent has recognized as excluded from the due process clause, and that's sovereigns. And because the P.A. and the P.L.O. are not recognized as sovereign by the United States, they are by default persons entitled to due process protection. That's at pages 8 to 12 of their CVSG brief. So an actual state would not be covered by the Fifth and Fourteenth Amendments, but an organization that is substituting for that is protected by the Fifth and Fourteenth Amendments? Well, I think the line, as it's correctly been drawn, at least in the lower courts, is that if it walks and talks like a government, it's not a sovereign state until the United States recognizes it as sovereign. And there are plenty of entities out there that exercise so-called governmental functions, but ultimately it's binary, right? If you're either a person for purposes of the due process clause and entitled to due process protections, or you're a sovereign state and you're entitled to the protections of the Foreign Sovereign Immunity Act, but there's no no-man's land where you're neither a sovereign state nor a person. What if other countries recognize respondents as a state or a sovereign? I think this court's decision in Zivotofsky makes it very clear that there's only one vote that matters on this issue, and it's not the 140-odd other countries that recognize Palestine as sovereign. It's the vote of the President of the United States, who has exclusive authority to recognize it as a sovereign state. Can I ask you to step away from the 14th Amendment? Assume you're absolutely correct that this statute fails every test we have applied under the 14th Amendment. I'll even grant you that, because I think it does, okay? But assuming that, the argument here has not centered on that. It's centered on the Fifth Amendment. And so would you address why, if we find that the 14th Amendment jurisprudence is not informative of or equal to the Fifth Amendment, why do you win? Meaning, there's been a variety of tests proposed. The other side and the government seem to say the Fifth Amendment would look to whether there is a federal interest, and jurisdiction reasonably relates to the protection of that interest. I think that's their test. How do you fit that? Well, I would say this is a situation where we don't need ad hoc new standards that clearly at least some members of the court are struggling with here today. We have a very old standard that I think makes sense. Yeah, but their struggle is, why don't we say, there's no limitation. Their struggle doesn't appear to be with creating a limitation. Their struggle seems to be, well, there's no historical basis for a limitation on Fifth Amendment federal jurisdiction. I don't know why it has to be limited. Their theory has to be limited to the international or foreign affairs. Their theory would say, if there's no limit, it applies to U.S. citizens as well as to foreign citizens. So we can step past that. Okay. Well, so I guess I'd build a Fifth Amendment test this way. And I'll start with Your Honor's observation, I think, in your concurrence in Daimler, that fundamentally jurisdiction requires reciprocal fairness. And that's going to be true under the Fifth Amendment and the Fourteenth Amendment equally because both protect liberty interests. And if it protects a liberty interest, there's no suggestion in any of the previous case law that a liberty interest is worth less under the Fifth Amendment than it is under the Fourteenth Amendment. And if both protect a liberty interest, then it remains true, as the Court said in Murray's last seat, that Congress cannot simply say what due process is. It's not up to Congress entirely. And I think that goes to the government's concession that the earlier cases were just a story riding circular. Or otherwise, they were opining on cases that weren't decided. Murray's last seat is this Court's precedent that says the legislative will is not enough to define due process. So what is the test? And I would say the test has developed by the Court of Appeals is the correct one, which is that you adjust the forum for which a forum connection is required to be the United States as a whole because of the distinct Federal interests rather than State interests. But you still apply a minimum contact test because of the reciprocal fairness that underlies the minimum context test. Do you think that that reciprocal fairness applies as well when one's speaking of foreigners as it does to a domestic context? I mean, even our view of fairness here as in large sense being about reciprocity, I would think doesn't quite translate as well into the international context, which we're not used to thinking that way. If anything, I would say respectfully, Justice Kagan, that the fairness component is probably exponential when it comes to dealing with foreigners because of the kinds of concerns that the government has articulated here, the kinds of concerns that were articulated in Daimler about overly grasping jurisdictions. I assume that if we purport to have exorbitant jurisdiction for foreigners but not for domestic citizens or residents, then you are really inviting an international comedy problem. But there's no reason doctrinally to read into either the Fifth Amendment or the Fourteenth Amendment a different definition of persons that would exclude foreigners. A lot of the earlier case law, including those that Justice Gorsuch alluded to, are dealing with foreigners. And there's no assumption that while we're dealing with foreigners because they deserve less. If I may give one example that I think helps exemplify this and gets us back to any concern about original public meaning. Nobody likes pirates, right? Pirates have been bad from the founding. Nobody ever thought that even though piracy is a crime against humanity or it's a crime that fits in the Define and Punish Clause, that certainly the United States can define piracy as an offense. But the United States does not try pirates in absentia because there's a delta between what Congress can prescribe as laws and what courts can do in adjudicating individual claims against someone who violates a law of extraterritorial effect. Justice Sotomayor, in her commentary I think in RGR Nebraska, notes that why are we dealing with the concern about the extraterritorial reach of a statute when there is separately a jurisdictional defense that would have to be considered? And there's always been an understanding from the founding that personal jurisdiction in the custody of the judicial branch is something over and above what Congress can prescribe. Certainly that's true in the piracy. You can't try them in absentia. You've got to get personal jurisdiction service process on them and therefore have a court of competent jurisdiction. But the court's never gone further in the Fifth Amendment context than that to start using principles of substantive due process. There's that oxymoron again from the Lochner era, no less, to say that more is required beyond the original understanding. And it seems both sides would ask us to kind of play with that toy a bit. And you perhaps a little more aggressively than your friends on the other side. I think it's a toy that should be left in the box because there's no reason. I can sort of paraphrase something that Your Honor said in Mallory. This is a case where you don't need a new rule. This is a case where a very old rule really applies. And the old rule that applies, albeit at the court of appeals level but uniformly, is that the fairness that always underlay the Fifth Amendment and due process, even in P.K. and Tolan and all these ancient cases where they talk about principles of fundamental fairness. Ancient cases being our precedent. Well, I'm not sure that P.K. Some of them are lower court opinions, but they're precedents on the books. Right. And perhaps worthy of respect as well as our newer stuff. Not only do I respect- For the Lochner era, no less. I think I share that Your Honor's fondness for Murray's Less See because you alluded to it in Jharkhand. And Murray's Less See is a 19th century precedent of this Court, not some justice riding circuit, opining and dictum what he thinks maybe might be the rule in some case for the question that wasn't presented. Charming Betsy, you know, as well. Right, but Murray's Less See says, as plain as you like, that the legislative will alone cannot define what Fifth Amendment due process is. No one disputes that. But the question is, if you're going to start adding things on to it beyond what was originally understood and exists in our precedent for a long time, that's quite a toy. And as Justice Kavanaugh pointed out, you know, you're going to be second-guessing the executive branch and the Congress and the political judgments they've made about what does and doesn't interfere with international affairs. I don't think that's true for at least two reasons, if I may. And one is that there's a huge open question in this case, right, about what activity. If you're focusing only on the activity prong, as Your Honor had alluded in some earlier questions, then the question is not what does due process allow. You don't have to reach that question because, as the government conceded, the statute contains a large number of exclusions where essentially whatever sovereign power Congress had and the President signed off on, they've laid down arms. They said, okay, we're not going to count for jurisdiction. U.N. activity, meetings with the U.S. government, and ancillary activities. Well, ancillary is a huge, undefined term, and we don't know what that means. And the reason we know that means that there's not at the moment unanimity between the legislature and the executive is the government's opening brief cites two offices of legal counsel opinions dealing precisely with the Palestinian government, one in 2018, one in 22. They are a rich font of guidance, I think, in this area of what is the interest of the United States. Counsel, can I interrupt and ask a question? So even under the 14th Amendment, we do look back at historical practice, and I'm thinking of TAG jurisdiction, for example. So for purposes of the Fifth Amendment, would TAG jurisdiction be okay in the context of a foreign defendant? I think that if TAG jurisdiction is limited to individuals, as Your Honor pointed out in your opinion in Mallory, it wouldn't apply to entities like the PA and the PLO, but there's no reason if history tells us, right, and that's the whole purpose of Burnham is that if there's a historical tradition behind TAG jurisdiction, then for individuals there's really no reason to treat that differently. Okay, so if history matters for things like TAG jurisdiction, even under the 14th Amendment, could we say that under the Fifth Amendment we similarly look at history and we see a tradition of treating foreign individuals, foreign defendants, differently from domestic or from American citizens? I think analytically you could say that we could ask the question, but I don't think if your question implied that that's the answer that history gives, I don't believe. I understand. I'm just asking if we could ask the question, because you agree that history informs the content of due process, even in the 14th Amendment context, and so it might not be one-to-one, right, between the Fifth Amendment and the 14th Amendment, because history might bear differently on the United States than on any individual state. Well, I guess a couple of points on that, if I may. One is I do think that history matters if you're writing on a blank slate, that there's a reason why foreigners have not been treated differently under the 14th Amendment, and then just to bring in one concern Justice Jackson raised, as exemplified by Judge Ho's concurring opinion in the Douglas case. He said if we're going to start treating the Fifth and 14th Amendment differently, then we are going to have to throw out the window the doctrine of incorporation, because are we now diluting all of the rights that apply to the state? Well, I mean, I think that's stretching it a bit far. I don't think we're throwing incorporation out. I mean, I think you can still recognize that the Fifth Amendment incorporates fundamental fairness or substantive due process, right, and I think this can be about personal jurisdiction. So I think that's kind of a way of trying to – well, I just don't think it's necessary to go that far. I think they're distinct issues. If the court doesn't need to, doesn't want to, and for whatever reason doesn't go that far, I think that what the historical case law tells us, whether it is Justice's story writing circuit, whether it's the court in Poland, whether it's the charming Betsy, you name it, all of the Frigate cases, almost all of which involve reaching out to either a ship of a foreign nation or a foreign merchant, that there is indeed equal solicitude for foreign. Okay, and I'll just say one other thing about incorporation. I think one distinction between your situation and that, and it's kind of what I was struggling with some of the questions I was asking your friends on the other side, is that we have doctrine in the context of incorporation already. There's already precedent on point, and as you point out, then we're not writing on a blank slate. So in the 14th Amendment context, whatever one thinks of international issue, we're not writing on a blank slate. We have quite a long line of precedent after that. We don't have squarely on-point precedent in the Fifth Amendment context in personal jurisdiction as we do in substantive due process, and so that's why I think it's not – that's why we're here. It's still an open question. And I do understand it's an open question, and to the extent the Court is approaching it with a blank slate, I would say the factors that matter are not just what is the original meaning and what does history tell us. It's certainly important. But if jurisdiction is supposed to mean anything, it is supposed to provide predictable, reliable rules known in advance. And I believe it was Justice Thomas who alluded to the Chamber of Commerce amicus brief here, which once it gets past the point of debating whether or not we're persons entitled to due process, lays out all the reliability concerns that says you're going to have to throw out four decades of 14th Amendment due process jurisprudence as understood to apply in Federal question cases if you decide the Fifth Amendment provides differential protection from the 14th. And that is given that a core function of jurisdiction is to provide predictable rules in advance, exemplified here by the fact that the PA and the PLO genuinely don't know when you read the statute when you're under the activities prong, what is it that implicates the activities prong. It has to be predictable and reliable. So if you do write it in a blank slate, then you're going to already have opened a Pandora's box of the problem of people saying, all right, I've got to reorder all my affairs. I would like, if I have time, and I don't see the red light, is on to just address some of the other questions that I heard from the court. I do believe Mr. Kneedler made an extremely important comment, and to some extent I believe the plaintiffs have conceded this as well, that there's a large open question if you focus exclusively on the activity prong of what is covered. What is the meaning of ancillary? What is the meaning of official U.N. business? Earlier I alluded to, but perhaps didn't finish the thought, about the Office of Legal Counsel opinion, which say two important things. One, it offers a view from the executive's point of view in the context of the Palestinians as to what activity is allowed. And it basically said no matter what Congress says, we the executive believe the Palestinians are allowed to engage in incidents of diplomacy, like speaking to the Palestinian diaspora, like speaking to American citizens about Palestinian rights, and the only reason that matters is if we're litigating on remand, should it come to that. What is the meaning of ancillary activities? The OLC opinions are directly germane. Point two about the OLC opinions, it says, look, we the executive, and this really goes to the government's point, have exclusive control of how this country interacts with the Palestinian government. To the extent any statute out there, whether it's the 1987 Anti-Terrorism Act or anything else says we can't do something, or what they want us to do imposes a condition contrary to a condition we would impose, we view that as unconstitutional. So I would respectfully say that as far as the statute goes in its uninterpreted form, it reflects Justice Kavanaugh's executive and legislative unanimity, but the minute you get down into the details of what's ancillary activity, does the executive branch take a contrary position on a case-by-case basis, that unanimity unravels. Can I just ask you about, just taking you back to the potential equivalence or not of the 14th and the Fifth Amendment. Do you concede that there are principles of interstate federalism and sovereignty that are at play in the 14th Amendment context that are not apposite in the Fifth Amendment context? The answer is yes, but only in the imposed jurisdiction context, not here in the consent jurisdiction context. The plurality opinion authored by Justice Gorsuch and the concurring opinion authored by Justice Alito and Mallory, which counts to five, a number I've heard earlier today, said federalism does not matter for consent jurisdiction. So yes, federalism matters for imposed jurisdiction, but not for consent jurisdiction. And why? Put note 10 in Vox, that gives you the answer. It says, someone may subject himself to powers from which he would otherwise be free, which is why federalism doesn't care if you consent to jurisdiction. So you would have us have a Fifth Amendment doctrine that is parallel to the 14th Amendment in the consent realm, with respect to consent. That's the only parallelism. I think they're identical, Justice Jackson, in the consent realm. I think that is what five members of this Court said in Mallory, that due process federalism concerns do not arise in consent jurisdiction. So then you win why, if we agree with you on that, that consent is the same in the two areas, then you say to the extent that this statute was one that imposed or deemed consent, then we're in that realm, and you win because? Because of the test, and I don't think the Court needs a new test for consent jurisdiction, which is Vox that tells us the defendant's actions must support a presumption of legal submission to the jurisdiction of the Court. And our argument below was neither prong of the PSJVTA, as applied in this case, reflects submission. Payments made overseas, outside of the antecedent sovereign authority of the United States. The United States can't say to Palestine, do or don't make that payment. That is not submission to a U.S. forum, and indeed that's what the Court of Appeals said. And as applied in this case, where our contention unresolved in the Courts of Appeals has been, is that all of our conduct is U.N.-related conduct and has previously been held to be insufficient to support jurisdiction, and the United States acquiesced in the Southern District of New York decision in the 1980s, in U.S. versus PLO, that U.N. activity can't support jurisdiction. All of those mean that when we continue to be engaged in U.N. and ancillary activities, we haven't submitted to jurisdiction. No new standard is required. And for more than 40 years, the Voxite submission standard, it hasn't turned the lower courts upside down. The courts know how to apply it. It's a facts and circumstances test. And the lower courts have been perfectly comfortable with Voxite. And not only that, all four opinions of Mallory in this Court cited the Voxite submission standard. It's good law. It remains good law. It shows why we win. I will try to burn quickly through a couple of other points. I think Justice Gorsuch asked if we were operating an office extra-legally. I think Mr. Kneedler very helpfully gave the answer, which is there's no question of extra-legal. We could debate all day long whether what we're doing is legal or not. But the fact of the matter is the statute simply excludes it. So from a constitutional avoidance basis, you don't need to reach the due process question. If the statute says this conduct does not support jurisdiction, that's the end of the story. The fact that the U.S. activities prong remains unadjudicated, as I think both sets of Petitioner's counsel acknowledge, you know, our position is that this was an as-applied case that looked at various activity. But if there's an open question as to what the ancillary activities exclusion means, then that's a matter for remand, because as I've heard from time to time, this is a court of review and not first view. And so that's grist for the mill for the Court of Appeals. I mentioned the OLC opinions. I guess I would just close with this thought, which is whether we're searching for historical meaning, whether we're searching for what did the first Congress think about jurisdiction, and I would respectfully say the one analogy that drives all the answers is pirates, right? Piracy has been illegal from the founding. The Alien Tort Statute incorporated it. Nobody from the founding has thought that Congress could say not only do we prohibit piracy, but tell you what, since we've prohibited piracy and because prescriptive jurisdiction and adjudicative jurisdiction are the same, we don't need to go to bother all that trouble of finding, extraditing, or renditioning the pirate. We'll just try him in absentia. That's never been the law, and that's because due process requires something more than what Congress prescribes. You might think, though, that what that suggests is that there's an obligation to provide notice and an opportunity to be heard without going as far as requiring minimum contact in the way we've done under the 14th Amendment. Yeah, and I would respectfully say that it's not just an Alien Tort Statute issue, but in all of this Court's extraterritorial application issues, there's been an observation, including by Justice Sotomayor, that we're dealing with a whole different problem, which is everybody obviously had notice in a case like RJR Novisco about what the statute purported to do, but Justice Sotomayor's opinion noted that, okay, but we still have a whole different kettle of fish to deal with in terms of personal jurisdiction. So it's more than notice, and I think that's why even if you want to give full significance to PK, and I promise I'll shut up and sit down, what the Court said in TOLA, what Justice Story said in TOLA, take a look at page 613. It said we have to deal separately with notice and regular personal appearance in court. So even Justice Story thought there was something more than notice in the form of a summons and jurisdiction. He likewise referred separately to jurisdiction and process at page 613. They are different things, and they have been different things from the founding. What exactly is the unfairness in this case? Is it too burdensome to litigate this in New York where the PA and PLO conduct some activities? What's the unfairness? The unfairness, as we said, I think you'll see it at pages either 56 or 57 to 58 of our Second Circuit brief in full, is the notion that we can be divested of a liberty interest for, and selectively at that, for being divested of a liberty interest for engaging in activity previously held constitutionally insufficient to support jurisdiction. And the second point, if I may, which is if you look at 14 … That doesn't sound like a personal jurisdiction argument, but anyway, go ahead. But when you look at all of the traditional 14th Amendment jurisprudence of this Court, it's got two prongs. It has minimum context, and then it has reasonableness. And so when we get the commentary, like in the dissent from Rehering on Bond, that it's not inconvenient for us to go from the PLO's U.N. mission in the East 60s to the Southern District of New York, that misses the point. That deals with the reasonableness prong. But that's prong two. The prong one is, is there reciprocal fairness sufficient to support jurisdiction in the form of minimum context? That's the unfairness, which is, you ever been on a train where it's sitting still, and another train's moving, and you have the impression you're moving backwards? That's what Congress keeps doing with these statutes, which is, we're doing the same thing. And Congress keeps moving the context around us. And that's what makes the statute as applied unconstitutional. And so we respectfully ask that this Court affirm the judgment of the Court. Before you sit down, do you think any degree of deference is owed to Congress and the President in this? No more deference than in the context of Holder, where the Court said, sure, we understand their policy judgment, but that does not require us to advocate the judicial role when it comes to constitutionally protected rights. And that is certainly a protected right committed to the judicial branch is jurisdictional. Well, the question was whether there should be judicial abdication or whether there should be any degree of deference. So is there any degree of deference owed or none? I would say in the context of jurisdictional due process, the answer is none. In the context of another statute that hits four square on the same issues, like the Taylor Force Act, which says if the Palestinian government continues to make these payments, we will withhold foreign aid, of course, deference is owed in that context. But when it comes to a constitutionally protected right, like jurisdictional due process, no, you don't defer away the protection for that. Thank you. Thank you. Justice Thomas, anything further? Justice Alito? Justice Sotomayor? Justice Kagan? Justice Gorsuch, anything further? Justice Kavanaugh? Justice Jackson? No, you may sit down. Thank you. Thank you, Mr. Chief Justice. Rebuttal, Mr. Kneedler? Several points, Mr. Chief Justice. First of all, with respect to reciprocal fairness, which I think counsel is deriving from the minimum context, if there are minimum contexts and you're subject to jurisdiction. But under the Fifth Amendment, minimum context is not the test. Perhaps some nexus is, and that's because the United States, in the exercise of its powers, is not limited to the territorial jurisdiction of the United States. It could criminalize the making of these payments, as I had understood respondents to say, in page 30 of their brief, if it could criminalize them, it seems clear that it should be able to count them as a basis for U.S. jurisdiction. But, again, with respect to reciprocal fairness, it's important to bear in mind that the payments being made here are payments to persons who have killed or injured Americans in acts of terrorism abroad. And I think when one is weighing reciprocal fairness, that basis for jurisdiction hardly seems unfair, particularly since it is a direct corollary to the lawsuits to which personal jurisdiction attaches, which is lawsuits under the ATA, which is designed to protect Americans from terrorism abroad. So if we're talking about reciprocal fairness, I think this case clearly satisfies it. Also, the reciprocal fairness seems to be tied to some sense of an exchange or a balance on either side. We don't think that that really comes from Mallory, but certainly in the context of the PA and the PLO, it doesn't make sense because we're talking about a 40-year relationship between the two in which fighting terrorism has always been a core part, and to try to find whether there's a bargain or an exchange at one point in time along that continuum of four decades of a relationship just doesn't make sense because Congress's statutes, and again, this is its third try to make sure that these lawsuits can be brought, it's a continuation of a policy over that period of time, and the Court should not focus only on the particular statute in isolation. But coming back to what is at the core of this case, and actually the Court wouldn't have to decide more, and that is that under the Fifth Amendment, Congress and the President made a judgment that is entitled to virtually absolute deference, that it is appropriate to subject the PA and the PLO to jurisdiction in this case. Respondents had a chance to avoid that by just stopping those activities, but they didn't. So whether one thinks of that as consent or just an element of fairness or overall suitability, that should count for a lot. The Court should sustain the act of Congress. Thank you, Counsel. The case is submitted.